USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/27/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROSS KESSLER,

Plaintiff,

- against -

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

Defendant.

---

**REPORT AND RECOMMENDATION TO THE HONORABLE RONNIE ABRAMS**

13cv1760-RA-FM

**FRANK MAAS**, United States Magistrate Judge.

Plaintiff Ross Kessler ("Kessler") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income benefits ("SSI"). The parties have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commissioner's motion, (ECF No. 17), should be granted and Kessler's motion, (ECF No. 9), should be denied.

I. Procedural Background

On December 5, 2009, Kessler filed an application for SSI benefits, claiming disability as of July 5, 2007. (Tr. 102).[1] In his application, Kessler alleged that

---

[1] Citations to "Tr." refer to the certified copy of the administrative record filed with the answer. (ECF No. 6).

he was disabled because he experienced constant pain in his back, neck, and left shoulder that made it difficult for him to lift heavy objects, stand for long periods of time, and concentrate on work tasks. (Id. at 121). The Commissioner initially denied Kessler's application on March 8, 2010. (Id. at 59-70). After obtaining counsel, Kessler requested a de novo hearing before an administrative law judge ("ALJ"). (Id. at 71-72). On June 14, 2011, ALJ Roberto Lebron ("ALJ Lebron") held the requested hearing by video conference. (Id. at 32-55). Thereafter, on July 29, 2011, the ALJ issued a written decision concluding that Kessler was not disabled within the meaning of the Act. (Id. at 20-27). The ALJ's decision became final on January 11, 2013, when the Appeals Council denied Kessler's request for review. (Id. at 1-4).

Kessler then commenced this action on March 15, 2013. (ECF No. 1). On August 12, 2013, Kessler filed a motion for judgment on the pleadings, (ECF No. 9), and on January 23, 2014, the Commissioner cross-moved for judgment on the pleadings, (ECF No. 17). Kessler filed reply papers on February 18, 2014. (ECF No. 19). Both motions consequently are fully submitted.

## II. Factual Background

### A. Non-Medical Evidence

Kessler was born on May 23, 1966, making him forty-three years old at the time of his application for disability benefits. (Tr. 34). Although he did not graduate from high school, he completed a GED program in 1985. (Id. at 36). He subsequently

began work as a correction officer with the New York City Department of Correction. He remained in that position until July 2007, when the Department placed him on disability leave due to injuries he had sustained during numerous inmate attacks. (Id. at 38). Upon his departure from the Department of Correction, Kessler began full time work as a security guard at a jewelry store. After approximately one year, Kessler stopped working full-time and began working only one or two days per week. (Id. at 37). Although he indicated in a May 2010 Social Security filing that he had not worked since December 2009, (id. at 133), Kessler testified at his disability hearing that he held his part-time job at the jewelry store until April or May 2011, (id. at 36-37).[2]

At the time of his disability hearing, Kessler lived in a single-family home with his wife and two children, ages seventeen and twenty. (Id. at 35). Although he generally was able to care for his personal needs, his wife took care of all of the household cleaning, cooking, and grocery shopping. (Id. at 50). He reported that he occasionally watched television, but sometimes had difficulty following the plot line because heavy doses of his pain medications made it hard for him to concentrate. (Id. at 49). When it came to interacting with others, he tried to avoid strangers and large crowds if possible, but was able to handle them if necessary. (Id. at 49-50).

---

[2] Kessler's hearing testimony appears to be correct since his wife telephoned one of his doctors in March 2011 to request a letter indicating when Kessler could return to work. The doctor's letter, dated March 18, 2011, states that Kessler could return to work "with no restrictions" on April 11, 2011. (Id. at 102, 501-02).

During the hearing, Kessler complained of sharp, constant pain in his left shoulder and lower back, and occasional pain in his neck. (Id. at 40, 42). The pain worsened when he sat or stood for long periods of time and when he walked on an incline. (Id. at 42-43). Over the years, Kessler had undergone four separate surgeries to repair injuries to his shoulder, neck, and lower back: a herniated disc repair in 1989, two left rotator cuff repairs in 1994 and 2006, and a cervical spine fusion in 2007. (Id. at 38-39). He also had physical therapy to manage his pain and improve his strength. (Id. at 41). Despite the surgeries and physical therapy, however, he still found it necessary to take regular doses of pain medication – primarily Oxycodone – to help alleviate his pain. (Id. at 45). According to Kessler, his pain medications often made him angry and left him unable to focus at work. (Id. at 40). As he described it, the Oxycodone put him "on . . . edge" and made him feel like he was "in another world." (Id. at 45, 46).

When asked about his current physical capabilities, Kessler testified that he could stand and walk for twenty to thirty minutes on flat ground, or approximately five minutes on an incline, before he had to stop to sit down. He indicated that he was able to squat, but suffered pain when doing so. He further testified that he could make a fist with both hands, although his left grip was weaker than his right due to his neck surgery. In addition, he was able to lift up to ten pounds without pain or difficulty, but only if his arm was fully extended. (Id. at 46-47).

Finally, Kessler testified that he frequently suffered from spells of anxiety, which often were triggered by forced public interactions. He further indicated that he experienced "racing thoughts" and difficulty concentrating, which were brought on by his constant pain and discomfort.

B. Medical Evidence

1. Orthopedic Treatment

Kessler's history of orthopedic issues dates back at least to 1987, when he experienced an unexplained "sudden onset" of lower back pain. (Id. at 449). Two years later, he was diagnosed with a herniated disc at the L5-S1 level, and underwent lumbar discectomy surgery to correct the injury. (See id. at 38, 184, 340). He later reinjured his lower back in 2005 when he was in a motor vehicle accident. (Id. at 449).

Kessler had his first of two left shoulder rotator cuff repair surgeries in 1994, after an inmate assaulted him while he was working for the Department of Correction. (Id.). He underwent similar surgery several years later in 2006, this time to repair a "SLAP" tear[3] in his left shoulder. Following his second shoulder surgery, Kessler attended physical therapy to help restore his strength.

Kessler did not experience any further orthopedic complications until one morning in October 2007, when he awoke with "intolerable," "severe" pain in his neck

---

[3] A SLAP tear is "an injury to the labrum of the shoulder, which is the ring of cartilage that surrounds the socket of the shoulder joint." SLAP Tears, OrthoInfo, http://orthoinfo.aaos.org/topic.cfm?topic=A00627 (last visited August 27, 2014).

that radiated through his left shoulder to his left forearm and down to his wrist. A few days later, Kessler underwent an MRI, which revealed a herniated disc at the C5-C6 level that had caused severe spinal cord compression on the left C6 nerve root. (Id. at 200). On October 25, 2007, Kessler visited Dr. Jeffrey Degen, a neurosurgeon, to discuss his pain. Kessler reported that he first experienced symptoms four weeks earlier, when he twisted his neck while lifting heavy boxes in his attic. While he noted some mild pain at the time the injury occurred, that pain suddenly had become severe, and had led to some degree of numbness and weakness in his left upper extremities. (Id. at 199). After reviewing Kessler's MRI results and performing a full physical examination, Dr. Degen opined that Kessler's symptoms most likely were a result of the disc herniation in his cervical spine. (Id. at 200).

Dr. Degen explained to Kessler that this type of injury normally could be treated with physical therapy, and that surgery generally was reserved for patients whose physical therapy had failed. Kessler, however, did not believe that he could participate in physical therapy given the pain he was experiencing. Thus, with Dr. Degen's approval, Kessler elected to undergo immediate cervical spinal fusion surgery on October 26, 2007. (Id. at 202, 203-06). Kessler "tolerated the surgery well" and reported "complete relief" of his pain during a post-operative examination. (Id. at 200). Three weeks later, at a follow-up examination with Dr. Degen, Kessler indicated that he had been "essentially pain free" since the surgery. Dr. Degen found that Kessler's strength was "excellent

throughout," with the exception of some weakness in his left bicep that had been present before the surgery. (Id. at 201). Dr. Degen referred Kessler to physical therapy to help maintain the surgery's positive results, but indicated no need for further treatment. (Id.).

Kessler returned to Dr. Degen's office on January 22, 2008, for a follow-up assessment. Kessler reported that he felt "100 times better" than he had before surgery, and Dr. Degen noted an "marked[] improve[ment]" in his upper extremity strength. (Id. at 198). Dr. Degen again advised Kessler to see a physical therapist who could demonstrate exercises to help rebuild his strength. (Id.).

The next time any physician referenced Kessler's orthopedic condition was in February 2009, when Kessler was seen by Dr. Stanley C. Giudici, a psychiatrist and internist. Another physician had referred Kessler to Dr. Giudici for a mental health examination after Kessler reported increased levels of agitation and irritability. Dr. Giudici noted that Kessler recently had experienced difficulty sleeping soundly due to pain in his neck and left shoulder. The notes from this initial visit indicate that Kessler was experiencing pain in his neck, left shoulder, and lower back, which he described as "5/10" in terms of intensity. Kessler reported that he had gone to physical therapy and seen a chiropractor in the past, but that neither helped relieve his pain. Dr. Giudici did not perform a physical examination at the time, but he did prescribe Tizanidine, a muscle relaxant, to help relieve Kessler's pain. Dr. Giudici further instructed Kessler to return in six weeks. (Id. at 304-06).

Dr. Giudici examined Kessler again on April 29, 2009. Kessler indicated that the Tizanidine had not helped, and that he still experienced pain in his shoulder, neck, and lower back that made it difficult for him to sleep. (Id. at 307-08). Dr. Giudici discontinued the Tizanidine, and instead prescribed Oxycodone, a stronger pain medication. (Id. at 310). He again instructed Kessler to follow up with his office in six weeks. (Id.).

When Kessler returned to Dr. Giudici's office on June 24 and August 13, 2009, he reported that the Oxycodone helped with his pain, but did not improve his sleeping habits. Despite this representation, he continued to report pain at the 5/10 level in his shoulder, neck and lower back. (Id. at 311, 313, 316, 318). During the August 13 visit, Dr. Giudici performed a physical examination and observed that Kessler was unable to reach overhead with his left arms, and experienced "severe" cervical and lumbar spasms with multiple trigger points throughout his spine. Dr. Giudici further noted that Kessler had a significantly decreased range of motion in his cervical and lumbar spine. (Id. at 318). Dr. Giudici referred Kessler for an MRI, taken later that month, which revealed a disc herniation and moderate disc degeneration at the L5-S1 level with severe degenerative changes in the ligamentum flavum,[4] and a large amount of scar tissue

[4] The ligamentum flavum is a ligament of elastic fibrous tissue that binds together the laminae of adjoining vertebrae, forming the back wall of the vertebral canal between the vertebra. Stedman's Medical Dictionary (27th ed. 2000) ("Stedman's).

surrounding the exiting right S1 nerve root, all of which had caused moderate central canal stenosis. (Id. at 276-77).

Kessler continued to see Dr. Giudici approximately every four weeks for the next few years. Dr. Giudici's observations with respect to Kessler's orthopedic condition remained relatively unchanged. (See, e.g., id. at 329, 334, 345-46, 351, 352, 357-58, 363-64, 370-71, 395-96, 412-13, 430-32, 450-51, 460-61, 470-71, 480-82, 490, 492).

By January 2010, Kessler told Dr. Giudici that the Oxycodone was "working well," though it often caused him to feel "fatigue[d]" and "run down." (Id. at 342). Then, on February 2, 2010, Kessler woke up with moderate to severe pain in his lower back, which he reported to Dr. Giudici during his next visit. Dr. Giudici prescribed Baclofen, a muscle relaxant, to help relieve the pain. (Id. at 348, 352). A month later, Kessler reported no changes in his symptoms, so Dr. Giudici increased the Baclofen prescription, which caused "slight improvement" by March 2010. (Id. at 345, 360). In addition, Dr. Giudici referred Kessler for EMG testing, which revealed normal sensory and motor nerve conduction, (id. at 283), and ordered x-rays of Kessler's lumbosacral spine, which showed severe disc narrowing at the L5-S1 level with mild retrolisthesis,[5]

---

[5] Retrolisthesis is a posterior displacement of a vertebral body that can cause localized back pain, pain on hyperextension, and sciatic pain due to irritation of the first sacral nerve root. Dorland's Illustrated Medical Dictionary, 619 (27th ed. 1988).

bilateral facet arthropathy[6] at the L5-S1 level, and straightening of the lumbar lordosis, (see id. at 449).

By May 2010, Kessler reported to Dr. Giudici that his medications provided "adequate control" for his pain. Nonetheless, during that visit, Kessler indicated that the pain in his left shoulder and lower back were now "7/10," and that the Oxycodone had reduced his pain by only about fifty percent. (Id. at 369). He described his shoulder pain as "constant with spikes of pain" and his back pain as "throbbing." (Id. at 370). He indicated that his back pain worsened during prolonged periods of sitting, standing or walking, and upon flexion. (Id.). His shoulder pain worsened when he lay on top of the joint and with adduction. (Id.). Dr. Giudici ordered a set of x-rays, which revealed no change in Kessler's lumbar spine, but some degree of degenerative change in his left shoulder. (Id. at 289-90). After one month with no improvement, Dr. Giudici increased Kessler's Oxycodone prescription. By July 2010, Kessler indicated that the Oxycodone was "helping a bit," but that his pain was still "7/10." (Id. at 382, 385).

On October 10, 2010, Kessler underwent an MRI of his left shoulder, which showed no evidence of recurrent nerve impingement and no full thickness tear. It did, however, reveal some joint effusion, some fluid in the subacromial bursa,[7] and possible

---

[6] Facet arthropathy is a form of degenerative disease affecting the joints that connect the vertebrae in the posterior spine. Stedman's.

[7] A bursa is "a closed sac or envelope lined with membrane and containing fluid, usually found or formed in areas subject to friction." The subacromial bursa is found in the (continued...)

tendonitis. (Id. at 429). During his next visit, Dr. Giudici recommended that Kessler do isometric exercises at home to help improve his shoulder condition.

In February 2011, Dr. Giudici referred Kessler to Dr. Guillermo Uy, a surgeon, after Kessler reported pain in his groin. During his visit with Kessler, Dr. Uy conducted a physical examination and observed normal musculature with no skeletal tenderness or joint deformities. Dr. Uy noted that Kessler led a "very active lifestyle" and "goes to the gym frequently." (Id. at 526-27, 543-44). Despite what he had reported to Dr. Uy, Kessler returned to Dr. Giudici's office the next month and indicated that he still experienced constant pain in his shoulder and lower back. Dr. Giudici thus once again increased his Oxycodone prescription. (Id. at 472). During his April 2011 visit, Kessler reported "adequate coverage of pain." (Id. at 474).

Over the next several months, Kessler saw various physicians for issues unrelated to his orthopedic condition. Many of these physicians conducted physical examinations, and all were normal. (See, e.g., id. at 294, 494-95, 503, 506, 513, 519, 522). Nonetheless, Kessler continued to report severe pain during his visits with Dr. Giudici.

On June 21, 2011, Dr. Giudici completed a Medical Source Statement in connection with Kessler's present application for benefits. He opined that Kessler could lift and carry up to ten pounds continuously, up to twenty pounds frequently, and up to

---

[7](...continued)
shoulder joint. Stedman's.

fifty pounds occasionally. In addition, he reported that Kessler could continuously push, pull, grasp, reach, and handle objects with his right hand and arm, but could not do so with his left hand and arm without experiencing pain. Dr. Giudici indicated that Kessler could not crouch or climb ladders or scaffolds, but could occasionally climb stairs and ramps, balance, kneel, and crawl. Although Kessler could operate a motor vehicle, Dr. Giudici indicated that he could not use standard public transportation and could not walk at a reasonable pace or on uneven surfaces. Dr. Giudici further noted that although Kessler had to change positions frequently due to his pain, he could sit, stand, and walk for two hours each, and six hours total, during an eight-hour workday. (Id. at 562-68).

2. Mental Health Treatment

Kessler initially was referred to Dr. Giudici in February 2009 because he had reported potential symptoms of mental illness. (Id. at 303). Although Kessler denied any history of mental illness, he indicated that he frequently felt angry, agitated, and irritated, and that his symptoms had negatively impacted his leisure activities and his relations with others. (Id. at 303). Kessler rated his overall mood as a "5/10." Upon examination, Dr. Giudici noted that Kessler maintained normal energy and concentration levels, appeared alert and oriented, and demonstrated linear, goal-directed thought processes. At the conclusion of his evaluation, Dr. Giudici diagnosed Kessler with impulse control disorder, and prescribed Lexapro, an antidepressant medication. (Id. at 303-06).

By his next visit with Dr. Giudici in April 2009, Kessler reported a seventy percent improvement in his self control. Kessler indicated that he thought the Lexapro calmed him down and gave him a "longer fuse." (Id. at 307). Over the next several years, Dr. Giudici made minor changes and adjustments in Kessler's mental health drug regimen, but his observations and diagnoses remained essentially unchanged. (See id. at 311-493, 571-80).

3. Respiratory Treatment

Kessler's medical records reflect a history of moderate obstructive sleep apnea, which first was documented during a sleep study performed on October 10, 2010. (Id. at 241-47). Kessler's physician suggested that he use a CPAP[8] mask at night to improve his breathing. Kessler returned to the same physician several times thereafter, complaining that the mask was too uncomfortable and the pressure was set too high. (Id. at 221, 223-24, 236). Kessler's physician made several adjustments to the mask's fit and pressure, but Kessler continued to use the mask only sporadically. (Id. at 51, 234). Even when he did wear the mask, Kessler testified that it often came off in the middle of the night, which caused him to wake up coughing and vomiting. (Id. at 51). In light of these difficulties, Kessler's physician eventually recommended that he undergo surgery to

---

[8] "CPAP" stands for "continuous positive airway pressure," which is a form of "respiratory therapy, in either spontaneously breathing or mechanically ventilated patients, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilatory circuit." See Stedman's.

correct his sleep apnea. (Id. at 40-41, 236). According to Kessler, that surgery was scheduled for June 27, 2011, a few weeks after his disability hearing. (Id. at 40-41).

4. Consultative Medical Examination

On January 25, 2010, Dr. Suraj Malhotra performed a consultative internal medical examination in connection with Kessler's disability application. Kessler's primary complaints during this examination related to his orthopedic injuries. Kessler told Dr. Malhotra that he had experienced persistent, "throbbing" neck pain for the last five years, which he characterized as "2/10" in terms of intensity. He also had experienced persistent "stabbing" pain at a "3/10 level" in his left shoulder for the past thirteen years. Finally, Kessler reported persistent, "throbbing" lower back pain, at a "5/10" intensity level, which radiated to his right leg and worsened during prolonged periods of sitting and standing. (Id. at 184).

Upon physical examination, Dr. Malhotra noted that Kessler demonstrated a normal gait and station, and could walk on his heels and toes without difficulty. He could perform a full squat, was able to rise from his chair without difficulty, and needed no assistance getting on and off the examination table. He exhibited full grip strength in both hands, and full range of motion in his back and neck. Dr. Malhotra observed no tenderness or spasms in Kessler's back and neck. Kessler's Straight Leg Raising ("SLR") tests[9] were negative when he was sitting, but positive at sixty degrees on the right side

---

[9] The SLR is a test for the presence of lumbar disc protrusions and herniations. See
(continued...)

when he was lying down. Kessler had full range of motion in his lower extremities, with no muscle atrophy, no joint inflammation or effusion, and no sensory abnormalities. His right shoulder also demonstrated full range of motion, as did his elbows, forearms, wrists and fingers. His left shoulder was limited to 110 degrees forward flexion and ninety degrees abduction, with minimal tenderness on the anterior surface. Nonetheless, his upper extremities exhibited full strength, and showed no sign of muscle atrophy or sensory abnormality. (Id. at 186).

After evaluating Kessler's physical condition, Dr. Malhotra diagnosed him with mild obesity, asymptomatic hypertension, migraines, and an intervetebral disc herniation in his lumbosacral spine. As part of his diagnosis, Dr. Malhotra also noted that Kessler experienced pain in his back, neck, and left shoulder as a result of his four past surgeries. Dr. Malhotra opined that Kessler would have moderate limitations in his ability to lift his left arm above the shoulder level, but otherwise noted no functional restrictions. (Id. at 186-87).

D. Additional Medical Evidence Submitted After the Initial Hearing

In connection with his request for review by the Appeals Council, Kessler submitted additional medical records that post-dated the ALJ's decision. According to those documents, Kessler underwent an MRI on October 19, 2011, which revealed some

---

[9](...continued)
Braithwaite v. Barnhart, No. 04 Civ. 2850 (GBD) (DF), 2007 WL 5322447, at *3 n.4 (S.D.N.Y. Dec. 20, 2007) (citing 5-15 Attorney's Dictionary of Medicine (3d ed.) P-15.34(1) (2007)). A positive SLR test suggests nerve root pressure produced by lumbar disc herniation.

changes at the L5-S1 level, but no recurrent herniation. In addition, the MRI results showed a small disc protrusion on the right side of the L3-L4 disc, and bilateral foraminal stenosis at the L4-L5 level. (Id. at 570). Kessler also submitted Dr. Giudici's notes of Kessler's visit on March 19, 2012. Those notes indicate no significant changes in Kessler's physical or mental health. (Id. at 577, 579)

## III. Applicable Law

### A. Standard of Review

The parties have filed their cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings. See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); see Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

A district court is not permitted to review the Commissioner's decision de novo. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Schaal v. Apfel, 134 F. 3d 496, 501) (2d Cir. 1998)); Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that her decision is supported by substantial evidence. See Hickson v. Astrue, No. 09 Civ. 2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001). This means that the ALJ's factual findings may be set aside only if a reasonable factfinder would have had to conclude otherwise. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012).

B. Duty to Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, . . . [a court] must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Social Security Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks, ellipsis, and brackets omitted). Indeed, an ALJ's failure to

adequately develop the record is an independent ground for vacating the ALJ's decision and remanding the case. Id. at 114-15. When the record evidence is inadequate to determine whether an individual is disabled, the ALJ must contact the claimant's medical sources to gather additional information. Schaal, 134 F.3d at 505; Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 344 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1512(e), (e)(1)). The ALJ may do this by requesting copies of the claimant's medical source's records, a new report, or a more detailed report from the medical source. Jimenez v. Colvin, No. 11 Civ. 4599 (DRH), 2013 WL 1332630, at *8 (E.D.N.Y. Mar. 31, 2013).

C. Disability Determination

The term "disability" is defined in the Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. §§ 404.1520, 416.920 (the "Regulations"). The Second Circuit has described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on

> medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the [RFC] to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of the process. Berry, 675 F.2d at 467. If the Commissioner finds that a claimant is disabled (or not disabled) at an early step in the process, she is not required to proceed with any further analysis. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000). However, if the analysis reaches the fifth step of the process, the burden shifts to the Commissioner to show that the claimant is capable of performing other work. Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In assessing whether a claimant has a disability, the factors to be considered include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s]; and (4) the claimant's educational background, age, and work experience." Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980).

D. Treating Physician Rule

The "treating physician rule" requires an ALJ "to grant controlling weight to the opinion of the claimant's treating physician[10] if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence." Rosado v. Barnhart, 290 F. Supp. 2d 431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2)). As the Second Circuit has explained, a treating physician's opinion is typically accorded special consideration because of the "continuity of treatment he provides and the doctor/patient relationship he develops" with the claimant, which "place[s] him in a unique position to make a complete and accurate diagnosis of his patient." Monegur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

Nonetheless, the Commissioner need not grant "controlling weight" to a treating physician's opinion as to the ultimate issue of disability, as this decision lies exclusively with the Commissioner. See 20 C.F.R. § 404.1527(d); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Likewise, the Second Circuit has acknowledged that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of the consultative physician may constitute such evidence." Monegur, 722 F.2d at 1039 (internal citations

10 The Regulations define a "treating source" as any "physician, psychologist, or other acceptable medical source who provides . . . medical treatment or evaluation and who has . . . an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.902.

omitted). The Commissioner must, however, always provide "good reasons" for the weight, if any, he gives to the treating source's opinion. 20 C.F.R. § 404.1527(c)(2).

IV. Application of Law to Facts

The question presented by the cross-motions is whether the ALJ's decision is legally correct and supported by substantial evidence. Kessler seeks reversal of the ALJ's decision, and remand for the sole purpose of calculating benefits due, on the grounds that the ALJ: (1) failed to develop a complete medical record; (2) failed to consider the combined effects of all of Kessler's impairments; (3) improperly drew his own medical conclusions; (4) improperly credited the opinion of a consulting physician over the opinion of his treating physician; (5) erred in finding that Kessler was not credible; (6) failed to perform a function-by-function analysis of the effects of Kessler's impairments; and (7) improperly relied on the Grids as a basis for concluding that Kessler was not disabled. (ECF No. 10 ("Pl.'s Mem.") 15-25). The Commissioner disputes each of these assertions, maintaining that the ALJ applied the appropriate legal standards for determining disability under the Act and that her finding is supported by the evidence. (ECF No. 18 ("Comm'r's Mem.") at 1).

A. Duty to Develop the Record

Kessler contends that ALJ Lebron failed to develop the record fully because he did not ask Kessler whether he had attended physical therapy following his spinal fusion surgery in October 2007 and did not ask for any related physical therapy records.

(Pl.'s Mem. at 22). Kessler's contention, however, is belied by the transcript of the disability hearing. While discussing Kessler's back, neck and shoulder injuries, the ALJ specifically asked Kessler whether he had undergone physical therapy for any of his conditions. In response, Kessler indicated that the last time he had attended physical therapy was after his second shoulder surgery in 2006. (Tr. 41). Accordingly, it would have been futile to request physical therapy records related to Kessler's 2007 surgery, since those records did not exist.

Moreover, the records that did exist, along with Kessler's own testimony, provided a sufficient basis for the ALJ to reach a disability determination. Indeed, Dr. Giudici provided over 200 pages of treatment records detailing his monthly visits with Kessler over the course of more than two years. Nothing in Kessler's medical history suggests that there were any significant gaps in the record that the ALJ should have questioned. ALJ Lebron thus fully satisfied his duty to develop the record.

B. Disability Analysis

1. First Step

The first step of the sequential analysis requires the ALJ to determine whether the claimant has engaged in substantial gainful activity during the period at issue. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ here determined that Kessler had not engaged in substantial gainful activity since July 5, 2007, the alleged onset date of his disability. This determination benefits Kessler, and neither party disputes its accuracy.

2. Second Step

The second step of the sequential analysis requires the ALJ to assess the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. Id. § 404.1520(c). When assessing the severity of a claimant's disability at Step Two, an ALJ must consider the combined effects of all impairments, regardless of whether those impairments are "severe." Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995). If the ALJ determines that the claimant suffers from at least one "severe" impairment, he must proceed with the sequential analysis. Id. at 1030.

The ALJ here found that Kessler's degenerative disc disease, asymptomatic hypertension, mild obesity, and four previous orthopedic surgeries all would cause more than minimal limitations in his ability to perform basic work-related functions, and therefore constituted "severe impairments" under the Regulations. Neither party disputes the validity of these findings.

Kessler does, however, contend that the ALJ "erred in failing to combine the effects of all [his] impairments," including his subjective complaints of pain, his sleep apnea, and his purported inability to concentrate. (Pl.'s Mem. at 15). Kessler has not made clear whether he believes this error occurred at Step Two or at some later stage in the sequential analysis. Arguably, his motion could be read to take issue with the fact that the ALJ did not discuss whether these other conditions, in combination, amounted to a

"severe" impairment within the meaning of the Act. However, even if the ALJ should have expressly discussed these conditions at Step Two, any error at this stage was harmless. Because Step Two merely serves as a filter to screen out de minimis disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements. Fortier v. Astrue, No. 3:10 Civ. 01688 (MRK) (WIG), 2012 WL 3727178, at *9 (D. Conn. May 11, 2012) (quoting Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)). Since the ALJ identified at least one severe impairment at Step Two, he properly proceeded with the remainder of the analysis. Later, after considering all of Kessler's impairments, the ALJ concluded at Step Five that he was not disabled within the meaning of the Act. The ALJ's determination at Step Two therefore had no effect on the ultimate disability determination. See Karle v. Astrue, No. 12 Civ. 3933 (JGK) (AJP), 2013 WL 2158474, at *14 (S.D.N.Y. May 17, 2013) (assuming ALJ should have identified additional severe impairments, error was harmless since ALJ "included the limitations in his consideration of [claimant's] residual functional capacity and proceeded to step three.").

3. Third Step

The third step of the sequential analysis requires the ALJ to determine whether the claimant has an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). See 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ must base his decision solely on medical evidence, without regard to the claimant's age, education, or work

experience. Id. § 404.1520(d). If the ALJ finds that the claimant has an impairment that meets or medically equals a condition listed in Appendix 1, the claimant is considered disabled within the meaning of the Act. Id. § 404.1520(a)(4)(iii), (d). If the claimant's impairment does not meet the criteria for any listed impairment, the ALJ must continue to the next step of the analysis.

The ALJ here concluded that none of Kessler's impairments met the criteria of any impairment listed in Appendix 1. Neither party appears to dispute this determination, and for good reason. With respect to Kessler's back and neck injuries, the record contained no evidence of any sensory or reflex loss, no documented findings of spinal arachnoiditis, and no suggestion that Kessler was unable to ambulate effectively, at least one of which would be required to satisfy the criteria for the listing pertaining to spinal disorders. See Appendix 1 § 1.04. Moreover, since Kessler maintained perfect functioning in his right shoulder, he could not satisfy the criteria for the listing pertaining to joint dysfunctions. See id. § 1.02 (requiring extreme loss of function in both extremities). Kessler's sleep apnea plainly did not meet meet the listed criteria for sleep-related breathing disorders, since it was not accompanied by pulmonary heart disease. See id. § 3.10. Finally, Kessler's purported mental health limitations were not sufficiently documented in Kessler's medical records, and did not rise to the level of severity required under the listings pertaining to mental health disorders. See id. §§ 12.04 (affective disorders), 12.06 (anxiety-related disorders) (both requiring "medically

documented" persistence of symptoms). The ALJ therefore correctly concluded that Kessler did not suffer from a listed impairment.

4. Fourth Step

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), or the functions the claimant is able to perform despite his impairments, while considering the relevant medical or other evidence from the case record. 20 C.F.R. § 404.1524(a)(1), (3). The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

The analysis at this step involves a two-part inquiry. Murphy v. Barnhart, No. 00 Civ. 9621 (JSR) (FM), 2003 WL 470572, at *10 (S.D.N.Y. Jan. 21, 2003). First, the ALJ must consider whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the pain or symptoms alleged by the claimant. Sarchese v. Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b). Then, if the claimant makes statements about his symptoms that are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility and determine the extent to which his symptoms truly limit his ability to perform basic work activities. Sarchese, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *1.

a. Credibility Determination

In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony. Lugo v. Apfel, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998); SSR 96-7p, 1996 WL 374186, at *4. The Regulations require the ALJ to consider not only the objective medical evidence, but also

> [(i) t]he individual's daily activities; [(ii) t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; [(iii) f]actors that precipitate and aggravate the symptoms; [(iv) t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; [(v) t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; [(vi) a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and [(vii) a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)); see also Sarchese, 2002 WL 1732802, at *7 (listing factors).

Applying this framework, ALJ Lebron concluded that Kessler's combination of impairments could reasonably be expected to produce his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible in light of his physicians' observations and his own hearing testimony. With respect to orthopedic problems, the ALJ noted that Kessler had undergone a number of surgeries in the past, but had reported positive results

after each of them. (Tr. 23-24). Kessler's treating physicians also indicated that Kessler had full range of motion in his spine and all extremities other than his left arm, and that he maintained full motor strength in his left wrist and hand, although he had somewhat limited range of motion in his left shoulder. (Id. at 24-25). Moreover, Kessler's MRI records showed no evidence of recurrent nerve impingement in his spine, and neurological tests revealed that his disc degeneration had not resulted in any lasting neurological damage. (Id. at 25). In addition, the ALJ noted that Kessler could take care of his personal needs independently, socialized with friends on a regular basis, went to the gym frequently, and led a "very active lifestyle." (Id.). In light of these observations, the ALJ found Kessler's testimony regarding the limiting effects of his symptoms to be less than entirely credible. (Id. at 25).

Kessler raises a number of challenges to the ALJ's credibility determination. First, he contends that the ALJ misinterpreted his MRI records, and thereby erroneously concluded that they were inconsistent with Kessler's testimony. Next, he argues that the ALJ should have taken into account evidence that favored his credibility, including the consistency between his statements to his treating physicians and his testimony at the disability hearing, as well as his "excellent work record." Finally, Kessler claims that the ALJ should have afforded greater weight to Kessler's subjective complaints of pain, which Kessler claims are "entitled to great weight." (See Pl.'s Mem. at 23).

A federal court must afford great deference to the ALJ's credibility finding, since "the ALJ had the opportunity to observe [the claimant's] demeanor while [the claimant was] testifying." Marquez v. Colvin, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013); see also Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) ("Deference should be accorded the ALJ's determination [as to claimant's credibility] because he heard [claimant's] testimony and observed his demeanor."). Accordingly, so long as the credibility determination is supported by substantial evidence, this Court may not disrupt the ALJ's findings. Bischof v. Apfel, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999).

Contrary to Kessler's contentions, the record contains ample evidence to support ALJ Lebron's credibility determination. First, Kessler has not clearly articulated his reasons for believing that the ALJ misinterpreted his MRI results, and after carefully reviewing the ALJ's decision, there does not appear to be any evidence that he did. But even if the ALJ incorrectly interpreted these records, his credibility determination still deserves deference because it clearly is based on more than just the MRI results. For example, the ALJ took into account the fact that Dr. Giudici, Kessler's own treating physician, consistently observed full range of motion in the left shoulder, where Kessler claimed to experience constant severe burning pain. (Tr. 25). In addition, the ALJ noted that Dr. Malhotra observed full range of motion in Kessler's thoracic and lumbar spine. (Id. at 24). And with respect to Kessler's purported neck injuries, the ALJ pointed to the

fact that Kessler himself testified to only "occasional" neck pain. (Id.). In fact, just a few months before his hearing, Kessler told one of his treating physicians that he went to the gym "frequently" and "led a very active lifestyle." (Id. at 526-27). Although by the time of the hearing Kessler claimed that his back, neck and shoulder injuries severely limited his ability to perform work functions, the objective evidence, including Kessler's own testimony, clearly suggested otherwise.

Furthermore, although Kessler contends that he had a "good work history" and that his hearing testimony was consistent with what he told his treating physicians, neither of these facts, even if true, would necessarily entitle him to a different credibility finding. Although it is true that "a good work history may be deemed probative of credibility," it remains "just one of many factors" to be considered when assessing a claimant's credibility. Campbell v. Astrue, 465 Fed. App'x 4, 7 (2d Cir. 2012) (quoting Schaal, 134 F.3d at 502). Here, Kessler's testimony was not entirely consistent with what he told all of his treating physicians. As previously mentioned, although Kessler consistently told Dr. Giudici that he was in constant pain, he told another one of his treating physicians that he led a very active lifestyle and had no "systemic complaints." (Tr. 526-27). This inconsistency alone is sufficient to support the ALJ's adverse credibility determination. Moreover, even if Kessler's testimony had been entirely consistent with his complaints to his treating physicians, that would not require the ALJ to find him credible, especially where, as here, his subjective complaints were belied by

the objective medical evidence. See Alcantara v. Astrue, 667 F. Supp. 2d 262, 276 (S.D.N.Y. 2009) (ALJ must take subjective complaints into account only "to the extent that they are consistent with objective medical evidence").

Similarly, although Kessler contends that subjective complaints of pain are "entitled to great weight," that too is so only if the claimant's subjective complaints are accompanied by objective medical evidence. Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983). As previously noted, Kessler's subjective complaints of pain lacked the necessary objective medical support, and therefore were not entitled to any special weight. Accordingly, the ALJ's adverse credibility determination was not erroneous.

b. RFC Determination

After considering all of the objective medical evidence and rejecting Kessler's inconsistent subjective complaints, the ALJ found that Kessler could lift and carry up to ten pounds frequently and twenty pounds occasionally, could sit, stand and walk for up to six hours in an eight hour workday, and could occasionally reach overhead with his left arm. Given these capabilities, the ALJ concluded that Kessler maintained the RFC to perform a broad range of "light work,"[11] so long as the work involved no more than occasional overhead reaching. (Tr. 26).

---

[11] The Regulations define "light work" as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

In reaching his RFC determination, ALJ Lebron specifically noted that he concurred with the opinion of Dr. Malhotra, and also credited, to some extent, the opinions contained in Dr. Giudici's Medical Source Statement. Specifically, the ALJ accepted Dr. Giudici's opinion that Kessler would have difficulty reaching overhead with his left arm. He rejected, however, Dr. Giudici's conclusion that Kessler would have to change position constantly when sitting, standing, and walking due to his pain. As the ALJ noted, that opinion found little support in the diagnostic findings and was inconsistent with Kessler's own reported level of daily activity. (Id. at 25).

With respect to this RFC determination, Kessler first alleges that the ALJ violated the "treating physician rule" because he afforded greater weight to Dr. Malhotra's opinion than he did to Dr. Giudici's opinion. According to Kessler, the ALJ was required to give controlling weight to Dr. Giudici's opinions because, in his view, they were "well-supported" by the evidence in the record. (See Pl.'s Mem. at 20-21). For example, Kessler points to the fact that one of the SLR tests administered by Dr. Malhotra was positive, suggesting the presence of a herniated disc. In addition, he alludes to MRI results from August 2009 that revealed scar tissue surrounding a nerve in his lumbar spine. (Id.). Kessler contends that this objective medical evidence supported Dr. Giudici's opinion with respect to his ability to sit, stand, and walk. That argument fails for several reasons.

First, Kessler's positive SLR test, by itself, says little about his actual functional capabilities. Indeed, Dr. Malhotra acknowledged that Kessler had a herniated disc, but nonetheless observed full range of motion in his back and neck. (Tr. 186). Although the SLR test may support Dr. Giudici's herniated disc diagnosis, it does not, by itself, support the further conclusion that Kessler had limited ability to sit, stand, and walk for long periods of time.[12]

More importantly, even if certain medical records could be read to support Dr. Giudici's opinion, Kessler's own statements regarding his "very active lifestyle" clearly undermine that opinion's validity. The inconsistency between Dr. Giudici's opinion and Kessler's own purported capabilities alone gave the ALJ sufficient reason to discount Dr. Giudici's opinion. See Carvey v. Astrue, 380 Fed. App'x 50, 52 (2d Cir. 2010) (ALJ need not give controlling weight to treating physician's opinion when it conflicts with claimant's own testimony).

In addition to alleging that the ALJ violated the treating physician rule, Kessler appears to contend that the ALJ improperly substituted his own view of the medical evidence for that of a medical expert. (See Pl.'s Mem. at 17). The basis for this contention is somewhat unclear, since the ALJ expressly adopted Dr. Malhotra's opinion

---

[12] Dr. Malhotra's findings with respect to the SLR test were "positive supine 60 degrees right and left side negative" and "sitting negative bilaterally." (Id. at 186). The Commissioner contends that these findings were themselves inconsistent because the "results of supine and seated straight leg raising tests should matter." (Comm'r's Mem. at 21 (citing sources in id. n.9)).

and gave at least some credence to Dr. Giudici's opinion. (Tr. 25). In any event, this argument has no merit. Although it is true that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion," he remains "free to choose between properly submitted medical opinions" and to rely on those opinions in reaching his disability determination McBrayer v. Sec. of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983); see also Filocomo v. Chater, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.") (emphasis added). The ALJ here clearly relied on the medical experts' opinions, and not simply his own lay judgment, in reaching his RFC determination.

Kessler also argues that the ALJ "erred in failing to combine the effects of all of [his] impairments," including his subjective complaints of pain, his sleep apnea, and his difficulties maintaining concentration. (See Pl.'s Mem. at 15-19). To the extent that he raises this argument in relation to the ALJ's RFC determination, Kessler has not met his burden to prove legal error. The record reflects that the ALJ considered each of these impairments and the combined effect that they would have on Kessler's ability to work. Thus, the ALJ acknowledged that Kessler currently had some memory problems due to the fatigue caused by his sleep apnea, but he also noted that Kessler had surgery scheduled for a few days after the hearing to correct his condition. (Tr. 24). The ALJ also acknowledged that Kessler claimed to suffer from "chronic, debilitating pain," but

found that those complaints were inconsistent with the full range of motion that Dr. Giudici and Dr. Malhotra observed and with Kessler's purportedly "very active lifestyle." (Id. at 25). Further, since the ALJ had reason to discount Kessler's subjective complaints of pain, he also had reason to discount his allegations of concentration difficulties resulting from pain. In sum, although the ALJ considered each of Kessler's alleged impairments, he ultimately determined that some of Kessler's assertions regarding those impairments lacked credibility, and therefore properly disregarded them when assessing Kessler's RFC.[13]

Finally, Kessler argues that the ALJ erred at Step Four because he did not specify the functions that Kessler could perform when explaining his RFC determination. (Pl.'s Mem. 19-20). As support for this claim, Kessler cites Social Security Ruling 96-8p, which states that the ALJ's "RFC assessment must . . . assess [the claimant's] work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945." 1996 WL 374184, at *2 (July 2, 1996). The Regulations referenced in that ruling require the ALJ to assess the claimant's "physical abilities," "mental abilities" and "other abilities" affected by his

---

[13] Kessler also seems to contend that the ALJ erred because he evaluated Kessler's RFC before making his credibility determination. The ALJ's decision, however, plainly demonstrates otherwise. The ALJ first carefully considered the objective medical evidence, compared it with Kessler's subjective complaints, rendered his credibility determination, and discounted those of Kessler's complaints that did not comport with the objective medical evidence. Only after completing each of these steps did the ALJ reach a determination concerning Kessler's RFC. (See Tr. 26). The ALJ thus properly followed the procedures set forth in the Commissioner's Regulations.

impairment. 20 C.F.R. §§ 404.1545(b)-(d), 416.945(b)-(d). With regard to physical limitations, the ALJ must make a function-by-function assessment of the claimant's ability to perform a number of work-related activities, including sitting, standing, walking, lifting, carrying and reaching. 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). Once the ALJ completes the function-by-function analysis, he then may express the claimant's RFC in terms of exertional levels of work, e.g., sedentary, light, medium, heavy, and very heavy. Hogan v. Astrue, 491 F. Supp. 2d 347, 354 (W.D.N.Y. 2007). This is precisely the procedure the ALJ followed here. He first explicitly found that Kessler could lift and carry ten pounds frequently and twenty pounds occasionally, could sit, stand and walk for up to six hours total in an eight hour workday, and could occasionally reach overhead with his left arm. He then went on to express Kessler's RFC in terms of his exertional capacity, stating that he could perform a broad range of "light" work. (Tr. 26). The ALJ thus properly adhered to the Commissioner's Regulations. Kessler's allegations to the contrary are unfounded.

5. Fifth Step

At the fifth step, the ALJ must determine whether, based on the claimant's age, education, work experience, and RFC, the claimant could "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). As part of this analysis, the ALJ must determine whether there are jobs that the claimant could perform that exist in sufficient

numbers in the national ecomony. SSR 83-10, 1983 WL 31251, at *4 (1983). In an "ordinary case," when the claimant has only exertional impairments,[14] the ALJ may meet this burden by applying the Medical-Vocational Guidelines, also known as the Grids. Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986); see also SSR 83-11, 1983 WL 31252, at *1 (1983) (use of Grids to direct conclusion of "disabled" or "not disabled" allowed only when criteria of a rule in the Grids are "exactly met"). When a claimant experiences nonexertional limitations,[15] the ALJ, in certain situations, cannot satisfy this burden through use of the Grids alone. Bapp, 802 F.2d at 605-07. The Second Circuit has explained that the ALJ may not solely rely on the Grids if a nonexertional limitation "has any more than a 'negligible' impact on a claimant's ability to perform the full range of work." Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (quoting Zabala v. Astrue, 595 F.3d 402, 411 (2d Cir. 2010)). A nonexertional impairment is non-negligible "when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Zabala, 595 F.3d at 411 (internal quotations marks omitted).

Whether expert testimony is required must be determined on a "case-by-case basis." Bapp, 802 F.2d at 605-06. "[T]he mere existence of a

---

[14] "Exertional limitations" are "limitations and restrictions imposed by [a claimant's] impairment(s) and related symptoms" that affect his "ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b).

[15] "Nonexertional limitations" include, inter alia, most mental impairments, such as depression, anxiety, and inability to concentrate. 20 C.F.R. § 404.1569a(c)(1); SSR 85-15, 1985 WL 56857, at *2 (1985).

nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [Grids]." Id. at 603. In short, the ALJ may apply the Grids – without calling a vocational expert – if they "adequately reflect a claimant's condition." Id. at 605.

Kessler contends that the ALJ erred in relying on the Grids because his limited ability to reach overhead was a "nonexertional limitation" that required the ALJ to consider testimony from a vocational expert. Here, however, the ALJ determined that Kessler had the ability to perform light work and that his inability to reach overhead did not significantly impact his abilities in that regard. (Tr. 26). As a result, he was not required to seek testimony from a vocational expert. See Bapp, 802 F.2d at 605 (expert testimony required only if nonexertional limitations "significantly limit the range of work permitted by [claimant's] exertional limitations").

Because Kessler was a "younger individual" who had the equivalent of a high school education, ALJ Lebron turned to Section 202.21 of the Grids and found that Kessler was "not disabled." The ALJ therefore properly denied Kessler's disability application.

V. Conclusion

For the foregoing reasons, the Court should deny Kessler's motion for judgment on the pleadings, (ECF No. 9), and grant the Commissioner's cross-motion for judgment on the pleadings, (ECF No. 17).

VI. Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for extension of time for filing objections must be directed to Judge Abrams. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

Dated: New York, New York
August 26, 2014

FRANK MAAS
United States Magistrate Judge

Copies to:

Honorable Ronnie Abrams (via hand delivery)
United States District Judge

All counsel (via ECF)